Please the court. My name is Ridley Whitaker. I represent the plaintiff Dennis Bauch. Can I ask you a really preliminary question? Was Infotech ever served with process in this case? Yes. You want me to describe it? I'd like to. I'm trying to figure out how it was served. Initially what happened was we served their attorney of record in Cyprus. They did not appear then. We defaulted them on failure to appear. Then they appeared, and what Judge Bianco did at that point was say, essentially, I'd like you to vacate the default, Whitaker, if they'll consent to service. Okay. And they did. I needed to know. Your Honors, the issues in this case I think were described by NYT's counsel to Judge Bianco at oral argument. It's one paragraph. I'll read it. Plaintiff claims that he was discriminated against on the basis of his being white, Western, and non-Muslim. With respect to the discrimination claims, there's really no dispute that he's in a protected class. There's no dispute that his performance was acceptable. We've had nothing but accusations from NYT that Bok's performance was not acceptable. In fact, in this case, after Bok was accused of ‑‑ Is there any dispute that students lodged the complaint? No dispute. And that the students contended that he was extremely rude, humiliating, disrespectful, and full of clear racism? Is there any contention on that? Well, that they ‑‑ they complain. I'm not suggesting that Mr. Bok was those things, but that was the allegation made by two students against him. Yes, which was a misunderstanding. I understood. And that the students ‑‑ but, okay. So let's go a little farther. Let's go a little farther. Let's go a little farther with what Judge Shin just did. And is it not that it's undisputed that for whatever reason, I think it was the students, that information, that allegation got leaked publicly and it created a brouhaha? No, that is disputed. It's disputed that it leaked publicly? Yes. It's disputed that it created a brouhaha? It's disputed. It's disputed that there was danger to your client, danger that he himself in repeated e-mails acknowledged? No. In the repeated e-mails, he was ‑‑ let's go back to your first question to me. Is it disputed as to whether or not the e-mails leaked? There's no information. Not the e-mails leaked. The fact of the complaint that he was anti-Muslim. There ended up being no evidence that it ever leaked. Well, there were two articles, right? That's undisputed. The articles had nothing to do with the student complaint. Well, we don't know what caused the articles, but there were two articles published that suggested that your client had engaged in blasphemous acts. Well, the articles accused him of having a Danish cartoon on his website. Okay. That created a brouhaha? No. There's no evidence it created a brouhaha. Their 30B6 witness came in and testified that there were never any threats against Bok in 2008 at all and that there were no student ever asked for him not to return and no student complained about him. And there was in March a student petition, which is part of the record, asking him to stay there. Why did the university do this? Why did the university send your client home? Why did they get him out of the country? Okay. Why and how. Okay. The why was basically the perception of the university that the income base, the parents, were upset that an American who was in an anti-American environment, as testified to by the president of the university, had somehow become controversial or became controversial because there were articles in the paper that accused him, maybe wrongly, of doing something blasphemous. There's no connection with the articles to anything that NYIT did. Then how was he controversial to the parents? He was a perception that he was controversial to the parents by this dean, Reed, who wrote his affidavit saying, I came in March and the parents were – I determined that there were parents who were upset. Okay. But the 30B6 witness came in and testified, and that's all hearsay, by the way, what Reed was saying. But the 30B6 witness came in and said, no, there was nothing going wrong on the campus. You have to show pretext discrimination. And I'm just trying to find out what is the evidence in the record to show that NYIT discriminated against your client. What is the evidence that their stated reasons, they said they were concerned about your client's safety, that those reasons were pretextual and a pretext for discrimination? First evidence is there was no danger to Balk at all at any time in 2008. The second reason is that if they were really concerned about Balk's safety, you look at page 34 of their brief that says, whenever I'm told by my security chief that there's a problem, I get Balk out of the country immediately. You're talking about pretext. Pretext. The first question there was, what is the evidence of discriminatory animus based on some protected category? There is evidence in the record that Dr. Giuliano, their president, testified there was an anti-American environment on the campus. Okay. Moyland, who is a professor, testified that Western faculty were wrongfully accused of wrongdoing and no one would back up the Western faculty. They would always defer to the Muslim accuser. With respect to pretext, the basic argument that's been advanced to you by NYIT is that any time Hussein said there was a security issue, that NYIT would act on it. Isn't Hussein your to get you to a trial, which is what you want, isn't Hussein your strongest point that Hussein would send e-mails? Hussein sent an e-mail back saying your client was guilty of being anti-Muslim for two years. Absolutely no basis in any record for that. And your client bought into it. Bought into it and acted on it. No. The point I'm trying to make is that if they want to take the position at page 34 of their brief that any time that they were told that there was a security problem, they get the guy out of the country, what were they told on February 25th by Hussein that there were unidentified they people who were going to put Bok in jail? There are e-mails from your client to a colleague saying that he was concerned about his physical safety. In other words, this was not just the school making this up. And e-mails from your client saying, you know, I guess this really is kind of my fault. I screwed up here. He explained that on his deposition. He just felt that he had gotten himself into a bad situation, not through his fault. But the point I want to make to you is their basic point is they acted reasonably when Hussein told them they needed to get Bok out of the country for a security reason. The first security issue was on February 25th. Hussein said there were people after Bok who were going to put him in jail. Did Giuliano act on that? Absolutely not. He concealed that from Bok. Your point is it's pretextual because they didn't act immediately. They sent a couple of people to the country to look into matters and pick up some evidence. And then they decided to act. After they got what they called the confession from Bok on February 28th. If the decision was made on February 26th, there's evidence in the record that there was a three-sentence conversation between Dr. Hussein and Dr. Giuliano. They said, well, get him out of the country. At one point, Giuliano says, well, maybe it was temporary. They bring him to the meeting on the 28th. They say, confess. They don't tell him about the Hussein e-mail, what Judge Bianco called the bigger issue. Yeah, but I don't understand that. You say that your fraud claim and your conspiracy to commit fraud claim rely on the permission to tell Mr. Bok about this e-mail. What did your client do, or what would your client have done if he had to? What was his reliance? If you're talking about the fraud claim, where's his reliance? The fraud claim, I'm not talking about the fraud claim in answering that. I'm talking about it, so you have to. I understand that, so I'm moving on to what you're asking me, okay? The fraud claim, in terms of what he was not told, is part of the conspiracy leading up to the time where he's told he's only leaving the country temporarily. He testified what he would have done if he'd known about it. What would he have done? He would have asked for an investigation and asked for the claim. And how would looking into whether the students leaked their complaint, which is what he said he would do because I read his deposition, how would his asking for an investigation in that into that have improved his position one iota? He would have improved his position because he would have known that Hussein was claiming that he was anti-Islamic, and therefore he would have had a criteria or a basis to raise issues with the university. The point is that on February 28th, Bok did not know that he had been accused of being anti-Islamic and there were people after him who would put him in jail. He then is called in to apologize to the students. That apology is later used by Infotech and NYT as evidence of misconduct by Bok. If, in fact, NYT cared about his ---- Sotomayor, is there a finding by NYT that Mr. Bok committed any kind of misconduct? NYT's position is they got him out of the country because they were concerned about his safety, and they didn't give him a new contract because they didn't have any positions that were available to him anywhere in the world. I will tell you where they claim he's engaged in misconduct, and that is at A588 in the record. There's an affidavit of Stephen Kloepfer claiming that he had given, quote, given his misconduct in Bahrain, Bok could not secure a work visa either for Bahrain or for Jordan. The only time you're ever going to see this visa story appear, which is not a safety-related issue at all, is after the fact. It's a continuous pattern of making up stories which prove pretext. You're also going to know ---- You're well over your time. You have three minutes for rebuttal, so why don't you hold it for that? Thank you very much. Shane. Go ahead. Good morning. My name is Douglas Catalano from Clifford Budd. This is a case that deals with nothing other than the safety of a faculty member who was teaching in Bahrain. Isn't the fact that your client's possibly agent, certainly contractor, Dr. Hussain, sent an e-mail saying, this man is anti-Muslim. It turns out he's been anti-Muslim for two years. I've uncovered evidence of it. And your client adopted ---- your client admittedly acted on the basis of Dr. Hussain's recommendation. Doesn't that at least get him a trial on the discrimination issue, not the fraud issue? Not at all, for any number of reasons. One, Dr. Giuliano said, I will take that. The exact words are in the record. I will take that under advisement. But Sy Reed and Hedy Arnone are coming to investigate. There was absolutely no actions taken. But there's a whole lot of testimony that they did what Hussain wanted. Hussain wanted him out of the country. They got him out of the country. I don't believe that that's accurate, Judge. But let's assume for sake of argument here in Manhattan, NYIT's outside security entity, Allied Barton, and I'm making up a name, and the Allied security individual says to the president or the dean or whoever is in charge of the facilities, you know, there's a dangerous situation here. You should consider what to do. That's what we have here with respect to ---- He didn't say you should consider what to do.  Put him in jail. All right. So here are some third parties saying, get him out of the country. Who cares what the third party said? We did not act upon it. Dr. Giuliano acted this. He hired Bork. He retained him for an additional year. He considered the safety under these circumstances, which was prompted, in fact, by Bork's own statements on February 28, I am concerned about my physical safety.        I mean, is he getting a trial? I mean, is he getting a trial? I mean, is he getting a trial? No. Ultimately adopted the discriminatory animus of Dr. Hussein. What's the discriminatory animus? Of Dr. Hussein. What did he say? He said he's anti- He's anti-Muslim. That doesn't mean, though. He's anti-Muslim. Here we are in Bahrain, and he's anti-Muslim. He's been anti-Muslim for two years. But it's not because of his age, race, color, creed, or national origin.   You can't be anti-Muslim. You can't be anti-Muslim. You can't be anti-Muslim. even if it's accepted as true, that statement, even if it's accepted that Giuliano acted upon it, it still doesn't make that a claim. There is absolutely not one fact that gives rise to an inference of discrimination. So if Hussein said he's anti-Islam, that doesn't mean that's a claim. There's a suggestion that there was an anti-American feeling on campus. 120 out of 141. First of all, that's hearsay and hypothetical theorem. But clearly, 110, 120 out of 140 individuals who were teaching in Bahrain were non-Muslim, quote, Westerners. Why? Because the whole emphasis of NYIT was to infuse the campus with individuals who came from this part of the world, if you will. The purpose was to have Western professors there. Yes. That was the purpose. And we had no problem with Bork. And as far as pretext, Dr. Giuliano and his colleagues went to great lengths in order to bring the campus together. Diffused the situation as the record reflects. And thereafter, and I must, it's almost startling about being spirited out of the country. Of course Bork left voluntarily. There was no kidnapping claim here. He was confused. No one's suggesting that. Well, if you read the tenor of what plaintiff is suggesting. Well, then they didn't let him back. In other words, they, he left the country, went to Jordan, and then instead of bringing the campus back, he went to Jordan. And instead of bringing him back, they send him back to New York. What does that mean? Bringing him back and sending him? Well, it means that you should calm down, by the way. You should calm down and listen to our questions and stop instead of talking over us constantly. The question is, the question is that he left in the heat of the moment. They moved him to Jordan for safety. And then instead of bringing him back, when things calmed down, they sent him back to the United States to appease the folks who were against Americans. That's the theory. So why don't you address that? He was not offered another position. In fact, I would argue that there isn't even an adverse employment action here. He had a contract from six to seven. He had a contract from seven to eight. They paid him out through July of 2000. Failure to hire is an adverse employment action, right? Failure to hire. Yes. He was expecting to be hired again for 2008, 2009. Somebody told him he was going to get a contract. Somebody told him he was going to get a two-year contract. He said specifically that I have no statement of a promise for a contract. Understood. I don't think he has a breach of contract claim. But even if there were. The question is, does he have a discrimination claim? Not a breach of contract claim. And there is no fact whatsoever that anything that occurred subsequent to that issue that he... But you answered Judge Chin's question. Did he put in any evidence that there were other positions within the United States for which he was qualified? Or in France or in... Or somewhere. Anywhere other than Bahrain. NYIT had a meeting with him and others on March 31. And there is record evidence that Pizer and others, the academic vice president at the time, made inquiries to place him in other global campuses such as China, such as Jordan. So they were making efforts to find him a place because he wasn't... I understand that. Did he identify any positions that he says he should have gotten? Were there any positions that he said, I'd like that position? And from which one could infer perhaps a discriminatory reason? So first, did he identify any positions that he says he should have gotten? No. Okay. Go ahead. So as far as the pretext, Your Honor, and pardon me for... You're getting excited. That's all right. Go ahead. Pardon me. As far as pretext, they went out of their way to protect him as a human being, to diffuse the situation with him, to attempt to get him a position elsewhere. And he voluntarily left by reason of his fear and by what he had done. And he does argue that he didn't really want to go. I mean, it's almost like a constructive leaving. Constructive leaving is the argument. I mean, that's the argument. Constructive discharge. Constructive leaving. Yeah. Constructive transfer. But assume that. Another question is whether there's any evidence to show that indeed that this was discriminatory. Again, none of the actions are even claimed by reason of fact to suggest that whatever occurred was by reason of him being Caucasian or being a non-Muslim. There are no comparators as an extension of this. Is plaintiff claiming that if another Muslim faculty member, and there were, who had purportedly defamed or engaged in this kind of conduct, that he or she is still teaching in Bahrain? Is the plaintiff suggesting that if Bork were Muslim, this wouldn't have happened? Of course he's not. And there are no facts to indicate that there's a comparator. So apart from the fact that there's no facts that indicate anything that occurred to him was by reason of his age, race, color, creed, or national origin. How do you respond to the argument that in some of those emails that he explained them away later on? The ones where he seems to admit he was concerned, et cetera. The argument is he explained them away. This was after the fact, perhaps in a deposition. But at that time, he was greatly concerned, not only on February 28th when there was a meeting in order to diffuse the situation, but thereafter. He said, I brought this all on myself. And he said, you can't have a faculty member with those allegations floating around. Plaintiffs don't like it. And on March 15, three weeks later, he said, the only significant issue is the safety concern. So here it is three weeks later. And frankly, I don't think it's in the record that he wanted to go back to Bahrain. On March 15th, he's still concerned about his safety because not only did he say that those statements purportedly were insulting the prophet, but on March 1 and March 6, these newspaper articles come out, which even heightened his anxiety because on March 15th, he's still saying, I have a safety concern. So NYIT then pays him out through the end of the semester, attempts to find him a place elsewhere. And there are no facts whatsoever. And again, pardon me for getting excited about this, that would indicate that they did anything other than attempt to protect his life based on perception. Thank you. We'll hear the rebuttal. Thank you, Your Honor. Is there anything in the record where contemporaneously, thereabouts, anything where Mr. Bok said, I would want to go back to Bahrain? Yes, there is. What is it? There is a statement on March 18th. He wrote and said he wanted to go back to Bahrain. He sent an email, two emails asking for his status, at which point they advised him that they would get back to him on his status. He wrote an email saying, can I go now? I've never really trusted this safety issue or I've been only courteous or sympathetic to it because that's what was expressed to me. These are all March emails. He definitely asked to go back to Bahrain. He was told that Infotech made the decision that he not go back to Bahrain. He had a conversation with Dean Revelous. It's in the emails, in the March emails. Is there any evidence of NYIT treating similarly situated non-white or non-American or Muslim professors differently? We're not dealing with comparatory? I understand that, but I want to know the answer. There is evidence in the case that presented by Moylan, who was the professor who visited from New York, that he was regularly accused of being anti-Islamic and teaching Romeo and Juliet with a Muslim teacher who was falling asleep in class. He complained through the hierarchy of NYIT and his complaints were ignored. That doesn't quite answer my question. The answer is, do I have any evidence that there was a Muslim professor in New York? No. Is there any evidence in the record of positions that he wanted and that he didn't get? He asked to go to New York. He didn't get it. He said he was willing to go. Were there openings in New York that he identified and said this is a position I would like? On March 31, when the opposing council says there was a meeting where it was discussed giving Balk a new job and everything, he raised the possibility of going to New York. They raised the possibility of going to New York. He said he would be willing to go to New York. He said he would be willing to go to Jordan. China didn't work out because it turned out that those were, it sounds like, those were the beginning discussions. Would you be interested in going somewhere else? What I'm trying to figure out is did there come a point when he can identify a position that he should have gotten that he didn't get purportedly for discriminatory reasons? There was an open position in New York and he didn't get it. He didn't get it. Was there one? He wanted to go back to Buck Rain and he didn't go back for discriminatory reasons. Okay. I think you've answered my question. Now, the March 31 meeting is important to focus on and I'll do it in ten seconds. It was supposedly a good faith, a representation of good faith by NYIT. That was at the meeting with Moreland testified where Reed refused to discuss anything. He said, he said that Bok had engaged in misconduct and then it was Reed who was supposedly, who was accusing Bok of misconduct who was supposedly in this good faith attempt trying to place him in Jordan. The whole after the fact attempts to find Bok's job, a job, were made either by Hussain who was accusing Bok of being anti-Islamic or by Reed who was accusing Bok of engaging in misconduct without using too strong a word the so-called find jobs after the fact was a sham. The two people who were involved, Hussain and Reed were, in a sense, totally down on Bok and had accused him of engaging in his misconduct. Those accusations of misconduct, we argue, are pretext. The inference of discrimination, we argue, is based upon Moylan's testimony that Western faculty were regularly accused of being anti-Islamic, NYIT deferred to the Muslim administration, if you will, that was recruiting the students and that creates the inference of discrimination. The pretext   The pretext is that they wanted to create a story on February 28th that Bok had done something wrong. After they had been told that Bok had done something wrong, on February 25th that there were people out after Bok to put him in jail. They didn't act on that and again, referring back to page 34 of their brief, they claim every time that Dr. Giuliano heard something from his security advisor he acted on it. They wanted to create a record on February 28th which they later used. There's evidence in this case that Infotech's council wrote to the Eastern District of New York saying, look at the letter that was signed by Bok. I just have a question, I'm sorry. Was it part of your client's job description, this may not be in the record, I don't know, to counsel students who were going to come visit the United States? I thought he was a computer teacher. Actually, in his job description, I read, pursuant to his contractual obligations to actively advise students, that's A172, his contract of employment. To actively advise students about the dangers that Muslims will face in the United States because they will confront a gay culture? He was charged with actively advising students. NYIT, Your Honor, had a transfer program between Bahrain and New York. And so, therefore, he was only doing the proper thing was, in his mind, advising students on what they might encounter in New York. Let me give you an example. His own recollection of what he said to the students is highly questionable, whether it's prudent to say some of the things that he acknowledges he said. I think that's for a jury to decide, Your Honor. Well, no, but it goes to whether students could be offended by what he said. Whether a reasonable student could be offended by what he said. And if a reasonable student was offended, then, of course, he committed what could be called misconduct. You're the one who says this whole misconduct thing is trumped up. Why don't you finish up? Finish up. What I say, Your Honor, is only two of the five students complained. It's in the record that 28 students then asked him to stay in Bach Rain. These two students were from one family, so it couldn't have been too much because all of his students supported him after the fact. If you take as an exception to the rule that two students could complain about a professor, that happens all the time in educational institutions. And Bach acted to resolve it and confirm with his students it was a misunderstanding.